UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBIN J. WEISENFELD,

     Plaintiff,                        Civil Action No. 16-11701

v.                                  HON.  THOMAS L. LUDINGTON
                                  U.S. District Judge
                                  HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

     Plaintiff Robin J. Weisenfeld ("Plaintiff") brings this action under 42 U.S.C. §405(g)

challenging a final decision of Defendant Commissioner denying her application for

Disability Insurance Benefits ("DIB") under the Social Security Act.  Both parties have filed

summary judgment motions which have been referred for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that

Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for

Summary Judgment be DENIED.

## PROCEDURAL HISTORY

     On April 3, 2013, Plaintiff file an application for DIB, alleging disability as of

September 7, 2012 (Tr. 203).  After the initial denial of the claim, Plaintiff requested an

administrative hearing, held on January 15, 2015 in Toledo, Michigan before Administrative

Law Judge ("ALJ") Richard Horowitz (Tr. 47).   Plaintiff, represented by attorney Sonny

Desi, testified (Tr. 51-70), as did  Vocational Expert ("VE") Mr. McBea (Tr. 70-76).   On

January 26, 2015, ALJ Horowitz found that Plaintiff was not disabled (Tr.  31-41).   On

December 16, 2015, the Appeals Council denied review (Tr. 8-10).  Plaintiff filed for judicial

review of the final decision in this Court on May 12, 2016.

## BACKGROUND FACTS

Plaintiff, born June 29, 1963, was 51 when the ALJ issued his decision (Tr. 41, 203).

 She completed four or more years of college and worked previously as a nurse (Tr. 232-

233).   She alleges disability due to arthritis and back pain (Tr. 231).

### A.      Plaintiff's Testimony

 Plaintiff offered the following testimony.

 She lived in Adrian, Michigan and stood 5' 3 ½" and weighed 175 pounds (Tr. 52).

She was married and lived with her husband and two children, ages 14 and 15 (Tr. 52).   She

seldom drove due to knee, foot, and shoulder pain (Tr. 52-53).   She typically relied on her

husband or mother-in-law for transportation (Tr. 53).   She was able to handle her own

finances (Tr. 53).  After becoming disabled, she lost her health insurance for nine months but

later regained it (Tr. 54).

Plaintiff worked as a nurse from 1995 to September, 2012 (Tr. 54).   She was unable

to resume work due to her inability to stand for more than 30 minutes at a time (Tr. 56).

Medication no longer helped her lower extremity pain (Tr. 57).  Injections had not improved

her knee condition (Tr. 57).  She had received treatment from a rheumatologist in the past

but believed that the knee condition of pseudogout[1] would not be improved with medication

(Tr. 58).  She did not experience a significant improvement after undergoing knee surgery

(Tr. 59).

Plaintiff's left shoulder and hand/wrist pain was not as severe as the lower extremity

pain but nonetheless interfered with her sleep (Tr. 59).  She had not received treatment since

losing her insurance due to financial constraints and her belief that no  treatment was

available until she underwent joint replacement surgery (Tr. 62).  She generally required a

cane for walking and was limited to walking a half block (Tr. 63-64).  She experienced

symptoms of what she believed was depression but had not received a diagnosis (Tr. 64).

She smoked around two cigarettes every other day and used alcohol on a recreational basis

(Tr. 65).  She denied the use of illicit drugs (Tr. 65).  She experienced difficulty showering

and cooking due to the inability to stand for more than 30 minutes (Tr. 65-66).  She alleviated

lower extremity pain by elevating her feet to hip level, adding that she spent 80 percent of

her waking hours with the legs elevated (Tr. 66).  She was unable to lift more than eight

---

[1]

Pseudogout, formally known as calcium pyrophosphate deposition disease ("CPPD") "is a form of arthritis characterized by sudden, painful swelling" of the joints. http://www.mayoclinic.org/diseases-conditions/pseudogout/basics/definition/con-20028152 (last visited April 12, 2017).  "The most commonly affected joint is the knee" and episodes of pain and swelling "can last days or weeks." *Id.*

pounds, squat, or crawl (Tr. 66-67).  She was able to climb stairs "very slowly" (Tr. 67).  She was unable to reach overhead with her left arm (Tr. 67).

In response to questioning by her attorney, Plaintiff reported that she had looked into employment that would allow her to triage patients telephonically but concluded that concentrational problems resulting for poor sleep ruled out such work (Tr. 68-69).  Her former employer was unable to offer her "accommodated" work due to her need to elevate her legs to waist level (Tr. 69).  Her physical functioning was also hampered by level "six" pain on a scale of one to ten (Tr. 69).

### B.    Medical Evidence

### 1.  Treating Sources

In June, 2012 orthopedic surgeon Alan H. Snider, D.O. noted Plaintiff's report of right knee pain lasting one month (Tr. 283, 309). In September, 2012, Dr. Snider, noting Plaintiff's report of continuing knee pain, opined that knee surgery would eliminate "hopefully most of her pain issues" (Tr. 285, 308).  In October, 2012, Plaintiff underwent arthroscopy and meniscectomy of the right knee for the primary condition of pseudogout (Tr. 288, 319).  She was prescribed Ultram for pain control following surgery (Tr. 286).   Dr. Snider's notes from later the same month state that Plaintiff "had a number of problems that [he] cannot fix," including pseudogout (Tr. 306).  He opined that Plaintiff would be able to return to work within the month (Tr. 306).   In December, 2012, Dr. Snider ordered five injections to the knee in response to Plaintiff's report of continuing pain (Tr. 304).  He

opined that the injections would make the knee condition painless for one to two years (Tr. 304).  In January, 2013, Dr. Snider composed a letter to Plaintiff's employer, opining that she required work restrictions due to ongoing knee pain (Tr. 300).  Later the same month, Plaintiff underwent a fifth injection, noting "definite" improvement from injections (Tr. 298).

In April, 2013, Wayne Smith, M.D. noted Plaintiff's complaints of continuing knee pain (Tr. 336).  Lab work from the same month was unremarkable except for slightly elevated glucose levels (Tr. 341-350).  The same month, Plaintiff underwent a mammogram (Tr. 315).  The following month, Plaintiff was diagnosed with sleep apnea and advised to lose weight and use a CPAP device (Tr. 357-358).  Rheumatologist Stephen J.Farber, M.D. examined Plaintiff, recommending imaging and laboratory studies (Tr. 340).

In March, 2014, Dr. Smith completed an assessment of Plaintiff's work-related abilities, finding that she had a "poor" prognosis (Tr. 383).  He stated that his findings were supported by "abnormal x-rays, abnormal operative findings, and abnormal surgical pathology reports" (Tr. 383).  He found that Plaintiff experienced a reduced range of motion (Tr. 384).  He found that Plaintiff experienced stabbing pain of the knees, shoulders, wrist, elbow, and ankles (Tr. 384).  He found that Plaintiff was limited to sitting, standing, and walking for a maximum of one hour in an eight-hour workday and was unable to lift more than 10 pounds (Tr. 385).  Due to arthritis of the hand, he found that Plaintiff experienced marked manipulative limitations, but noted that her medication was limited to Motrin (Tr. 386-387).  He found that Plaintiff was unable to perform any full-time employment (Tr.

388).  He precluded all pushing, pulling, kneeling, bending, and stooping (Tr. 389).

## 2.  Non-Treating Sources

In June, 2013, Scott Lazarra, M.D. performed a consultative examination on behalf of the SSA, noting right knee tenderness and a mildly reduced range of left shoulder motion (Tr. 368, 370).  He found that the use of a knee brace or cane would be advisable for pain control (Tr. 370).  He noted full muscle strength in all extremities and normal grip strength (Tr. 367, 370).  Plaintiff reported that she was able to manage most daily activities and could sit so long as her legs were elevated (Tr. 366).  She reported that she could walk one block and stand for 30 minutes (Tr. 366).

The following month, Shahida Mohiuddin, M.D. performed a non-examining assessment of the treating and consultative findings on behalf of the SSA, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, and walk for around six hours in an eight-hour workday; and push and pull without limitation (Tr. 84).  He found that Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling (Tr. 84-85).  Dr. Mohiuddin found no other limitations (Tr. 85).

### C.    Vocational Expert Testimony

VE McBea classified Plaintiff's past relevant work as a nurse as skilled and exertionally medium[2] (Tr. 271).  The ALJ then posed the following set of  restrictions,

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying

describing a hypothetical individual of Plaintiff's age, education, and work history:

> [L]ight work, that is she can lift 20 pounds occasionally, 10 pounds frequently; and sit for six hours in a[n] eight-hour day, stand for six hours in an eight-hour day, and walk for six hours in an eight-hour day; and she can push and pull as much as she can lift and carry.  Please also assume that she can use right foot controls only occasionally, and left hand controls frequently.  She can also reach overhead and in all other directions with the left arm frequently.  Please also assume that she can only occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; and only occasionally balance, stoop, kneel, crouch or crawl.  In addition, she can never work at unprotected heights or around moving mechanical parts; and can frequently work in conditions where there is dust, odors, fumes or other pulmonary irritants.  Assuming those facts, would the Claimant be able to perform her past relevant work as actually performed or as generally performed in the national economy? (Tr. 71-72).

Based on the above restrictions, VE testified that the hypothetical individual would be unable to perform Plaintiff's past relevant work or use transferrable skills (Tr. 72-73), but could perform the light, unskilled jobs of a hand packager (3,000 positions in the State of Michigan); photocopy machine operator (2,000); and mail clerk (2,000) (Tr. 72-73).

The VE testified that if the individual were limited to work allowing for a sit/stand option, the hand packager position numbers would be reduced to 500 to 1,000, the photocopy machine operator positions would remain unchanged, and the mail clerk position would be eliminated (Tr. 73-74).  The VE testified that if the hypothetical individual were limited to occasional handling and reaching with the left hand, all of the above-stated jobs would be

---

of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

eliminated (Tr. 74-75).  The VE testified that the need to miss more than 12 days of work each year, be off task for more than 20 percent of the workday, or elevate the legs for 80 percent of the workday would eliminate all competitive employment (Tr. 76).  The VE concluded by stating that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* and *Standard Classifications of Occupations* except for the testimony regarding the sit/stand option which was based on "general standard practices of human resource managers throughout the United States" (Tr. 76).

###  D.    The ALJ's Decision

Citing Plaintiff's treating records, ALJ Horowitz found that Plaintiff experienced the severe impairments of "calcium pyrophosphate deposition disease [CPPD] (peudogout); arthritis of the knee status-post two surgeries; and obstructive sleep apnea" but that none of the impairments met or equaled a listed impairment under 20 CF.R. Part 404, Subpart P, Appendix 1 (Tr. 33-34).  The VE found that Plaintiff retained the Residual Functional Capacity ("RFC") for exertionally light work with the following additional limitations:

> [C]an occasionally use right foot controls; can use left hand controls frequently; can reach overhead and in all other directions frequently with the left arm; can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffold; can occasionally balance, stoop, kneel, crouch, or crawl; can never work at unprotected heights or around moving mechanical parts and can frequently work in conditions w[h]ere there is dust, odors, fumes, or other pulmonary irritants (Tr. 34).

Citing the VE's findings, the ALJ found that while Plaintiff was unable to perform any of her past relevant work, she could perform the light, unskilled work of a hand packager,

photocopy machine operator, and mail clerk (Tr. 39-40).

The ALJ discounted Plaintiff's allegations of limitation.  He observed that Plaintiff obtained good results from knee surgery and had not sought care between June, 2013 and January, 2015 (Tr. 38).  He noted that while Plaintiff used a walker at the hearing, the use of a cane or walker had not been recommended by a treating source (Tr. 38).  The ALJ noted that Plaintiff's daily activities, including the care of pets, taking care of her personal needs, cooking, folding clothes, driving, and handling her finances stood at odds with the claims of disability (Tr. 38).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health*

*& Human Services*, 755 F.2d 495, 497 (6ᵗʰ Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The Treating Physician Analysis

Plaintiff argues that the ALJ erred by rejecting Dr. Smith's March, 2014 disability opinion in favor of the opinions of other treating evidence and the consultative and non-examining sources. *Plaintiff's Brief,* 10-18, *Docket #11-2,* Pg ID 451.

"[I]f the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)*(citing Wilson,* 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)). However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, see *Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. § 404.1527(c)(2))[3].  The failure to articulate "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good

---

[3]

In explaining the reasons for giving less than controlling weight to the treating physician opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' " *Gayheart*, at 376 (citing SSR 96–2p, 1996 WL 374188, *5 (1996)).

The ALJ addressed Dr. Smith's opinion, acknowledging the treating physician's finding that Plaintiff was unable to sit, stand, or walk more than one hour a day and experienced marked manipulative limitations (Tr. 37 *citing* 383-389). He then explained his reasons for according "very little weight" to the treating findings:

> [T]hey are inconsistent with the treatment records detailed above, and the claimant's robust activities of daily living. In fact, the record is devoid of all treatment records from June 2013 through January 2015. Likewise, it was noted that the only medications the claimant is taking are Motrin . . . and Diclofenac, which suggests that the claimant's pain is not as limiting as she has alleged. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physician's who might provide such a note in order to satisfy their patients requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case (Tr. 37).

Plaintiff assigns error to almost every word of the treating physician analysis. First, she disputes the ALJ's finding that Dr. Smith's findings were not supported, noting that the March, 2014 treating opinion referenced "abnormal" imaging and clinical studies. *Plaintiff's*

*Brief* at 12.  However, the imaging study cited by Plaintiff is an x-ray of the knee taken four months prior to her October, 2012 knee surgery (Tr. 283).  None of the post-surgical records (including Dr. Smith's own treating records)  support his opinion that she was unable to sit, stand, or walk for more than one hour a day.  While Dr. Smith observed a "slight limp" and a limited range of shoulder motion during an April, 3013 examination, the treating notes do not suggest that Plaintiff experienced greater restrictions than those found in the RFC (Tr. 34).  Contrary to Dr. Smith's finding that Plaintiff experienced "marked" manipulative limitations, none of his records (or anybody else's records) suggest that Plaintiff experienced any limitation in gripping or other fine manipulative activity (Tr. 386-387).  To the contrary, Dr. Lazzara's observations included Plaintiff's ability to "pick up a coin, button clothing, and open a door" (Tr. 38, 364).

Plaintiff's argument that Dr. Lazzara's consultative examination findings support Dr. Smith's opinion is also unavailing.  While she cites Dr. Lazzara's finding of decreased left shoulder function, the RFC, including a preclusion on the climbing of ladders, ropes, or scaffolds and otherwise occasional postural activity, generously accounts for Dr. Lazzara's observation of slight range of motion limitations of the left shoulder (Tr. 34, 368-369).  Moreover, Dr. Lazzara's findings as a whole contradict Dr. Smith's disability opinion.  While Dr. Smith found the presence of "marked" limitation in fine manipulations, Dr. Lazzara observed full grip and muscle strength (Tr. 367, 370, 386-387).   Dr. Smith's finding that Plaintiff was limited to lifting 10 pounds is particularly confusing, given that she told Dr.

-13-

Lazzara that she could lift 10 pounds on the left but had "no problems lifting with the right arm" (Tr. 366). While elsewhere in her argument, Plaintiff changes tacks by actually criticizing the ALJ for according significant weight to Dr. Lazzara's findings, *Plaintiff's Brief* at 15-16, the ALJ did not err in adopting the well supported consultative opinion over Dr. Smith's poorly supporting treating one. *See* SSR 96–6p, 1996 WL 374180, *3. (July 2, 1996)("In appropriate circumstances," the opinion of non-examining source "may be entitled to greater weight than the opinions of treating or examining sources"); § 404.1527(e)(2)(I); *See also Brooks v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 636, 642 (6th Cir. August 6, 2013)(same).

Plaintiff's related argument that the ALJ erred by according significant weight to Dr. Mohiuddin's non-examining findings because Dr. Mohiuddin did not have benefit of Dr. Smith's March, 2014 assessment is also unavailing.  To be sure, in some cases, the favoring of older acceptable medical opinions that do not reflect a review of the pertinent newer records may constitute reversible error. "When an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,' we generally require 'some indication that the ALJ at least considered these [new] facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Brooks*, 531 Fed.Appx. at 642  (*citing Blakley v. CSS*, 581 F.3d 399, 409 (6th Cir. 2009)).  However, as discussed above,  the ALJ provided a thorough discussion of Dr. Smith's opinion.  Further, Dr. Smith's March, 2014

-14-

opinion does not reflect "ongoing treatment" or give any other indication that Plaintiff's condition deteriorated after the consultative and non-examining records were created.  To the contrary, the ALJ noted that the transcript was devoid of any treatment records post-dating Dr. Mohiuddin's assessment (Tr. 38).

Plaintiff also takes issue with the ALJ's "wholly speculative conclusion that Dr. Smith rendered his opinions out of sympathy . . . or to avoid doctor-patient tensions . . . ." *Plaintiff's Brief* at 12 (*citing Lester v. Chater,* 81 F. 3d 821, 832 (9th Cir. 1995) (Tr. 37). I agree that the ALJ's apparently gratuitous comments were ill-advised.  However, *Lester* is inapplicable here.  In *Lester,* the Court faulted the ALJ for rejecting  a medical opinion of disability on the primary basis that his opinion was procured for purposes of litigation.  *Id.* at 832.  The Court determined that "'[t]he Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits.'" *Id.* (*citing Ratto v. Secretary*, 839 F.Supp. 1415, 1426 (D.Or.1993)).  In contrast to *Lester,* the ALJ in this case provided a number of "good reasons" (aside from speculation about Dr. Smith's possible bias) for rejecting the treating opinion.

The ALJ noted that Dr. Snider's followup notes from the October, 2012 procedure showed good results and that in January, 2013, he found that Plaintiff was capable of work allowing for some accommodations (Tr. 36).  While Plaintiff faults the ALJ's citation to Dr. Snider's January, 2013 findings on the basis that it did not specify Plaintiff's work-related limitations, the ALJ did not err in finding that the rest of the transcript pointed strongly to a

finding of non-disability.  He noted that rheumatologist Dr. Farber did not recommend "any limitation or restriction that would preclude . . . substantial gainful activity" (Tr. 37).  The ALJ noted that the RFC reflected Dr. Lazzara's observations (a slight limp and tenderness of the right shoulder) but rejected Dr. Smith's extreme and unsupported findings (Tr. 38).  My own review of the transcript indicates that  Dr. Smith's March, 2014 assessment of disabling postural and manipulative limitations bears little resemblance to the remainder of the records showing fairly mild and non-disabling limitations.  The ALJ's finding that the treating opinion "depart[ed] substantially" from the rest of medical transcript is well supported (Tr. 37).

Plaintiff also argues that in rejecting Dr. Smith's findings, the ALJ overstated her daily activities.  *Plaintiff's Brief* at 13-14.  She disputes the ALJ's finding that she engaged in "robust" activities of daily living.  *Id.* at 13 (*citing* Tr. 37).  Plaintiff is correct that activities of daily living performed on a sporadic basis do not necessarily support a finding of non-disability.  *Walston v. Gardner,* 381 F.2d 580, 586 (6th Cir. 1967).  The ALJ acknowledged Plaintiff's testimony that she had a hard time showering and performed limited household chores (Tr. 36).  However, he permissibly noted that Plaintiff's earlier assessment of her own capabilities showing a wide range of activities, coupled with the examination records showing only minor limitations in range of motion and full muscle strength, contradicted Dr. Smith's opinion of extreme limitation (Tr. 38).  He noted that Plaintiff was regularly able to care for pets, take care of personal needs, cook, drive, go out

-16-

alone, shop, pay bills, and handle bank accounts (Tr. 38, 241-243).  As such, he did not err in noting that Plaintiff's regular activities of daily living undermined Dr. Smith's finding of disabling symptoms.  *See Cruse v. CSS*, 502 F.3d 532, 542–43 (6th Cir. 2007)(*citing Walters v. CSS*, 127 F.3d 525, 532 (6th Cir. 1997))("'[a]n ALJ may ... consider household and social activities engaged in by the claimant in evaluating the claimant's assertion of pain or ailments'").

Finally, Plaintiff faults the ALJ supporting the non-disability determination by noting she had not sought treatment for the allegedly disabling knee condition for a total of two years.  *Plaintiff's Brief* at 14-15.  She  notes that for a period of time, she lost her health insurance and that she had been told that "there [was] not much that can be done to treat her condition." *Id.* at 15.  She notes her pain medication is limited to Motrin because she is allergic to narcotics and ceased taking another pain medication because it elevated her liver enzymes. *Id.*

Plaintiff is correct that under SSR 96–7p, 1996 WL 374186, *7 (1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." See also SSR 82–59, 1982 WL 31384, *4 (1982)(ALJ must consider an individual's claim that she is unable to afford the prescribed treatment).

-17-

However, the record shows that the ALJ questioned Plaintiff as to the reasons for her lack of treatment for two years (Tr. 62). He made note of Plaintiff's explanation that "she was told that nothing could be done for her [and] as such, she has not continued treatment" (Tr. 38). The ALJ did not err in finding that the gap in treatment nonetheless undermined the disability claim. He noted that although Plaintiff had re-obtained health insurance by the time of the hearing, she declined to followup with a rheumatologist (Tr. 38). The treating records, based on my own review, do not contain any indication that she was told that "nothing could be done for her" or any words to that effect. While Dr. Farber recommended imaging and laboratory studies in May, 2013, at no point did Plaintiff follow through with his advice (Tr. 340). Although Plaintiff testified that she did not return to Dr. Farber because she lost her insurance, she provides no satisfactory explanation for her failure to followup with the specialist (or another specialist) after obtaining new insurance. Accordingly, the ALJ's conclusion that the failure to obtain treatment undermined the disability claim should remain undisturbed.

### B. The Credibility Determination

In her second argument, Plaintiff argues that the ALJ's credibility determination, like the treating physician analysis, is based on an erroneous interpretation of the record. *Plaintiff's Brief* at 19-22.

The credibility determination, currently guided by SSR 96-7p, describes a two-step

process for evaluating symptoms.[4]  "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment ... that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186 at *2 (July 2, 1996).  The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."[5] *Id.*

Plaintiff's "credibility determination" argument is based primarily on the contentions raised and rejected in her first argument.  The ALJ did not err in finding that Plaintiff's use

---

[4]

In March, 2016, SSR 16-3p superceded SSR 96-7p. The newer Ruling eliminates the use of the term "credibility" from SSA policy. SSR 16-3p, 2016 WL 1119029, *1 (Mar. 16, 2016). The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." See 20 C.F.R. § 404.1529(c)(3), fn 7, below. Nonetheless, SSR 96-7p applies to the present determination, decided on May 11, 2015. See *Combs v. CSS*, 459 F.3d 640, 642 (6th Cir. 2006)(*accord* 42 U.S.C. § 405(a))(The Social Security Act "does not generally give the SSA the power to promulgate retroactive regulations").

[5]

In addition to an analysis of the medical evidence, 20 C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:  (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

-19-

of only Motrin and the absence of treatment records undermined the disability claim (Tr. 37-38).  While Plaintiff revisits her argument that her sporadic activities of daily living were improperly used as evidence of non-disability, the conclusion that the wide variety of activity (coupled with examining records showing good muscle tone and only minor range of motion limitations) is well supported by the record.  As discussed above, the ALJ was entitled to conclude that Plaintiff's failure to follow up with rheumatological treatment - even after procuring insurance - stood at odds with her claim that she was disabled from all work.[6]  The ALJ did not err in noting that although Plaintiff used a walker at the hearing, none of the treating records supported her alleged need for an assistive device (Tr. 38).  While Plaintiff argues that a claimant need not show that the walker or cane use was recommended by a physician, the ALJ did not err in finding that the absence of a treating recommendation for cane use, along with the lack of treatment and the fairly unremarkable consultative findings undermined the disability claim.  Because the credibility determination is well supported and explained, the deference generally accorded an ALJ's credibility determination is appropriate.  "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' " *Cruse, supra,* 502 F.3d at 507; *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989)(*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))(An ALJ's "credibility

---

[6]

    It bears repeating that in May, 2012 Dr. Farber recommended additional rheumatological testing (Tr. 340).  Plaintiff's failure to follow up with the recommended tests after re-obtaining insurance is certainly relevant to the credibility determination.

determination must stand unless 'patently wrong in view of the cold record'").

The ALJ's finding that Plaintiff was capable of a limited range of unskilled, exertionally light work is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level. As such, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than 20 pages in length

unless by motion and order such page limit is extended by the court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.


s/R.  Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: April 30, 2017


## CERTIFICATE OF SERVICE

I hereby certify on April 30, 2017, that I electronically filed the foregoing paper
with the Clerk of the Court sending notification of such filing to all counsel registered
electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF
participants.


s/Carolyn Ciesla
Case Manager to
Magistrate Judge R. Steven Whalen